UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| KALYN AGA, *et al.,* | CIV. 21-5059-JLV |
| Plaintiffs, | |
| vs. | ORDER |
| MEADE COUNTY, a political subdivision of the State of South Dakota, | |
| Defendant. | |

**TABLE OF CONTENTS**

I.      Introduction ..................................................................................2

II.     Standard of Review ......................................................................2

III.    Analysis ........................................................................................4

        A.      Res Judicata ......................................................................4
                1.      Facts......................................................................4
                2.      Arguments of the Parties .......................................7
                3.      Resolution of Defendant's Motion ...........................7
                        A. Same Issue.......................................................10
                        B. Parties, Opportunity, and Final Judgment ..........10

        B.      Comity ............................................................................12

        C.      State-Created Danger Claim ...........................................13
                1.      Facts ...................................................................14
                2.      Arguments of the Parties......................................18
                3.      Resolution of Count 1 ..........................................20

        D.      Equal Protection Claim...................................................21
                1.      Facts...................................................................22
                2.      Arguments of the Parties......................................24
                3.      Resolution of Count 2 ..........................................25

        E.      Inverse Condemnation Claim..........................................27
                1.      Facts ...................................................................29
                2.      Arguments of the Parties......................................29
                3.      Resolution of Count 3 ..........................................31

F.  Inverse Condemnation-State Claim.....................................34
    1.  Facts .......................................................35
    2.  Arguments of the Parties.........................................36
    3.  Resolution of Count 4 ............................................37

IV.  Order .........................................................................38

## I.   INTRODUCTION

Plaintiffs filed a multi-count amended complaint against the defendants. (Docket 7).  Plaintiffs voluntarily dismissed their claims against defendants United States Gypsum Corporation and Knauf KG.  (Docket 22).  Defendant Meade County filed a motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).   Plaintiffs resist Meade County's motion.  (Docket 17). For the reasons stated below, defendant's motion to dismiss is granted.

## II.   STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) provides for dismissal of plaintiffs' amended complaint ("complaint") if the complaint fails to state a claim upon which relief can be granted.  In evaluating Meade County's Rule 12(b)(6) motion, the court accepts as true all of the factual allegations contained in plaintiffs' complaint and grants all reasonable inferences in favor of plaintiffs as the nonmoving party.  Braden v. Wal-Mart, 588 F.3d 585, 594 (8th Cir. 2009) ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ") (citing Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009)).  See also Crooks v. Lynch, 557 F.3d 846, 848 (8th Cir. 2009) (the court must review "a Rule 12(b)(6) motion to dismiss for failure to state a claim,

accepting the facts alleged in the complaint as true and granting all reasonable inferences in favor of the plaintiff, the nonmoving party.") (brackets omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 556 U.S. at 679. The "plausibility standard" at the pleading stage requires a showing greater than the mere possibility of misconduct yet less than the probability of misconduct. Twombly, 550 U.S. at 556-58. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 570). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— that the pleader is entitled to relief." Id. (citing Fed. R. Civ. P. 8(a)(2)).

### III.   ANALYSIS

Plaintiffs' complaint is twenty-three pages in length, contains numerous conclusory statements of law, commentary on the facts and exceeds the boundaries contemplated by Rule 8(a)(2).[1]  (Docket 7).  The complaint asserts four claims against Meade County.  Those are:

1.    Violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, a "state-created danger due process" claim.  Id. at p. 13 (capitalization and underlining omitted).

2.    Violation of the Fourteenth Amendment, 42 U.S.C. § 1983, an "equal protection" claim.  Id. at p. 16 (capitalization and underlining omitted).

3.    Violation of the Fifth and Fourteenth Amendments, 42 U.S.C. § 1983, an "inverse condemnation" claim.  Id. at p. 19 (capitalization and underlining omitted).

4.    Violation of Article VI § 13 of the South Dakota Constitution, an "inverse condemnation state claim."  Id. (capitalization, underlining and parenthesis omitted).

Plaintiffs seeks compensatory and consequential damages and "other relief allowed by law or equity."  Id. at p. 22.  To resolve Meade County's motion to dismiss, the court will separately analyze each of plaintiffs' causes of action.

A.    RES JUDICATA

1.    FACTS

The court takes judicial notice of the state court proceedings in 46CIV20-000177.  Fed. R. Evid. 201.  Rule 201(b) states:

---

[1]Under Rule 8(a)(2), a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of this Rule is to give a defendant fair notice of plaintiff's claims and the grounds upon which those claims rest.  Twombly, 550 U.S. at 555.

> (b) Kinds of facts that may be judicially noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:
>
> > (1) is generally known within the trial court's territorial jurisdiction; or
> >
> > (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b). Because Meade County asked the court to take judicial notice of the state court litigation and plaintiffs referenced the same proceeding, the court finds the parties were provided an adequate opportunity to be heard on the issue of judicial notice. Fed. R. Evid. 201(e).

On June 8, 2020, 138 named plaintiffs ("state plaintiffs") filed a complaint in Circuit Court in the Fourth Judicial Circuit in the State of South Dakota. Trudo, et al v. Meade County, et al, 46CIV20-000177 at pp. 1-42. On July 1, 2020, the state plaintiffs filed an amended complaint alleging 20 causes of action against 35 defendants including Meade County. Id. at pp. 47-89.

On October 1, 2020, the state court granted Meade County's motion to dismiss the state plaintiffs' amended complaint. Id. at pp. 568-72. The order dismissed the amended complaint claims against Meade County with prejudice. Id. at pp. 571-72. The order also dismissed the claims against Meade County "without prejudice for insufficient service of process[.]" Id. at p. 572. In a November 20, 2020, order the state court clarified

> the Meade County Defendants [including Meade County] have voluntarily submitted to the jurisdiction of this Court, waived their right to service of process, and requested a judgment on the merits. To the extent that they requested a dismissal on service of process grounds, the Meade County Defendants specifically stated

5

that they would rely on that argument only to the extent that this Court denied their motion to dismiss for failure to state a claim.

Id. at pp. 934-35.

The state court plaintiffs filed two separate notices of appeal to the South Dakota Supreme Court from the state court order dismissing the amended complaint with prejudice.  See 46CIV20-000177 at p. 1004; South Dakota Supreme Court Appeal No. 29489; 46CIV20-000177 at p. 1384; and South Dakota Supreme Court Appeal No. 29931.  In each instance, the state plaintiffs moved to dismiss their appeal because there was no final judgment as it relates to issues associated with defendants other than Meade County.  See Appeal No. 29489, Docket 19, and Appeal No. 29931 at pp. 138-42.  With each appeal, the South Dakota Supreme Court dismissed the appeals because the orders were not a "final order appealable of right pursuant to SDCL 15-26A-3 . . . [as there was a] lack of a final judgment."  See Appeal No. 29489, Docket 19 and Appeal No. 29931 at pp. 154-57.  The most recent order of the South Dakota Supreme Court was entered on April 14, 2022.  See Appeal No. 29931 at p. 157.  The appeals dealt with only 11 of the 33 defendants in the state case.  Id.

On September 28, 2021, while the state case was pending, 158 plaintiffs, including the 138 state plaintiffs, filed a complaint in federal court. (Docket 1).  On November 4, 2021, plaintiffs filed an amended complaint. (Docket 7).  On November 17, 2021, Meade County filed a motion together with a legal memorandum seeking dismissal of plaintiffs' amended complaint. (Dockets 11-12).

6

2.    ARGUMENTS OF THE PARTIES

Meade County seeks dismissal of plaintiffs' federal amended complaint as it relates to the 138 state plaintiffs under the doctrine of res judicata. (Docket 12 at pp. 4-5 & 22-24).  Meade County asks the court to take judicial notice of the state litigation.  Id. at p. 6.  Applying the doctrine of res judicata, Meade County asks the court to find the state plaintiffs' claims are barred.  Id. at p. 22.

Plaintiffs acknowledge the existence of the state court litigation and the fact that the state court judge dismissed the state plaintiffs' claims against Meade County with prejudice.  (Docket 17 at p. 14).  Yet, plaintiffs argue res judicata should not apply as the decision of the state court was not a final judgment.  Id. at p. 15.

In rebuttal, Meade County argues "[t]here was no final judgment from which [the state] Plaintiffs could appeal as a matter of right because the order dismissing Meade County did not adjudicate all the claims between all of the parties and thus did not terminate the action."  (Docket 18 at p. 9) (referencing SDCL § 25-6-54(b)).  Because the state court dismissal was based on a failure to state a claim, Meade County asserts the decision "operates as an adjudication upon the merits."  Id. at pp. 8-9 (citing SDCL § 15-6-41(b)).

3.    RESOLUTION OF DEFENDANT'S MOTION

"The law of the forum that rendered the first judgment controls the res judicata analysis."  Schaefer v. Putnam, 827 F.3d 766, 769 (8th Cir. 2016). "[F]or res judicata to apply in this case: (1) the issue sought to be litigated in

7

the second suit must have been actually litigated in the earlier suit; (2) there must have been a final, unreversed judgment on the merits in the previous case; and (3) the wrong sought to be redressed must be the same in both actions." SDDS, Inc. v. State of South Dakota, 994 F.2d 486, 492 (8th Cir. 1993) (referencing Bank of Hoven v. Rausch, 449 N.W.2d 263, 265-66 (S.D. 1989)).

"Res judicata consists of two preclusion concepts: issue preclusion and claim preclusion." Estate of Johnson by & through Johnson v. Weber, 898 N.W.2d 718, 733 (S.D. 2017). "Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided, and also is referred to as direct or collateral estoppel." Id. (internal quotation marks omitted). In contrast, claim preclusion has a broader effect because it "prevents the relitigation of a claim or issue that was 'actually litigated or which could have been properly raised.' " Dakota, Minn. & E. R.R. Corp. v. Acuity, 720 N.W.2d 655, 660 (S.D. 2006) (citing Nelson v. Hawkeye Sec. Ins. Co., 369 N.W.2d 379, 381 (S.D. 1985)).

"The doctrine of res judicata is premised on two maxims: [a person] should not be twice vexed for the same cause and it is for the public good that there be an end to litigation. Res judicata seeks to promote judicial efficiency by preventing repetitive litigation over the same dispute." People ex rel. L.S., 721 N.W.2d 83, 90 (S.D. 2006) (internal citations and quotation marks omitted).

8

"The collateral estoppel doctrine 'bar[s] relitigation of an essential fact or issue involved in the earlier suit' if a four-part test is satisfied: '(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? (4) Did the party against whom the plea is asserted have a full and fair opportunity to litigate the issue in the prior adjudication?' " Hamilton v. Sommers, 855 N.W.2d 855, 866 (S.D. 2014) (quoting Estes v. Millea, 464 N.W.2d 616, 618 (S.D. 1990)).

"In examining whether these elements are present, a court should construe the doctrine liberally, unrestricted by technicalities.  However, because the doctrine bars any subsequent litigation, it should not be used to defeat the ends of justice.  Instead, courts 'must give careful consideration to the case at hand before erecting the doctrine's preclusive bar.' " L.S., 721 N.W.2d at 90 (quoting Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 401 (1981)).

Under South Dakota law, a court's analysis of the similarity in the prior judgment and the current case is comparable in both issue and claim preclusion.  Compare Hamilton, 855 N.W.2d at 866 (issue preclusion), with L.S., 721 N.W.2d at 90 (claim preclusion).  South Dakota courts have clearly delineated how to conduct that analysis in claim preclusion: "the Eighth Circuit [ ] in Hanson v. Hunt Oil Co., 505 F.2d 1237, 1240 (8th Cir. 1974), established the test which this Court has repeatedly applied: whether the

wrong for which redress is sought is the same in both actions." <u>Dakota</u>, 720 N.W.2d at 661 (internal quotation marks omitted).  But South Dakota cases applying issue preclusion have not directly held the same inquiry must be used.  <u>See</u> <u>Hamilton</u>, 855 N.W.2d at 866; <u>Estes</u>, 464 N.W.2d at 618.

A.     SAME ISSUE

In the first step, the court must determine whether the issues "actually litigated or which could have been properly raised and determined in a prior action" are present in the current case.  <u>SDDS, Inc.</u>, 994 F.2d at 492; <u>see also</u> <u>Dakota</u>, 720 N.W.2d at 660.

The claims of liability plaintiffs assert in this case are different from those asserted in the state case.  Absolutely identical proof is not required but only that the actions seek to address the same wrong.  <u>Farmer v. South Dakota Department of Revenue & Regulation</u>, 781 N.W.2d 655, 660 (S.D. 2010).  The parties do not dispute the issues litigated in the state court proceeding and this proceeding seek to address the same wrong.  <u>See</u> Dockets 12 at pp. 4-5 & 22-24 and 17 at pp. 14-15.  The court finds "the precise issues" in the present action are the same issues raised or which could have been raised by the state plaintiffs in the state court action.  <u>SDDS</u>, 994 F.2d at 493; <u>Dakota, Minn. & E. R.R. Corp.</u>, 720 N.W.2d at 660. The court finds the first element of issue preclusion is met.

B.     PARTIES, OPPORTUNITY AND FINAL JUDGMENT

Meade County and the state plaintiffs in this federal case are the same parties as those in the state case.  The parties acknowledge this reality.

10

Based on the court's determination, the state plaintiffs' action presented the same issues as their current federal amended complaint, or could have included those claims in the state case, the court finds the state plaintiffs had "a full and fair opportunity" to litigate the issues in the state court.  Hamilton, 855 N.W.2d at 866.

Meade County's argument on finality and the defendant's reliance on Allan v. Sheesley, 447 N.W.2d 361 (S.D. 1989), is misplaced.  See Docket 12 at p. 23.  In Allan, the order dismissing a cross-claim at issue had, in fact, been affirmed by the South Dakota Supreme Court in an earlier appeal.  "The dismissal of the cross-claim was appealed to [the South Dakota Supreme Court] court and [was] affirmed" in an earlier companion case.  Allan, 447 N.W.2d at 362.

That is not the procedural posture of the state case here.  While the state court order dismissing plaintiffs' case against Meade County was appealed to the South Dakota Supreme Court on two separate occasions, the order was never affirmed by that court.  Rather, the appeals were dismissed without prejudice because a final judgment had not been entered.  The state case decision in favor of Meade County is not a final judgment.  Black Hills Jewelry Mfg. Co., 336 N.W.2d at 157.

Defendant's request to dismiss plaintiffs' federal amended complaint based on the doctrine of res judicata is denied.

11

B.    COMITY

It is a well-recognized rule in cases of concurrent jurisdiction that "the doctrine of federal comity permits a court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir. 1985). "[C]ourts follow a 'first to file' rule that where two courts have concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case." Id. (citing Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 94-5 (9th Cir. 1982); Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1163 (10th Cir. 1982)). "[I]n the absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case." Id. (citing Merrill Lynch, Pierce, Fenner & Smith v. Haydu, 675 F.2d 1169, 1174 (11th Cir. 1982)). "The purpose of this rule is to promote efficient use of judicial resources. The rule is not intended to be rigid, mechanical, or inflexible, but should be applied in a manner serving sound judicial administration." Id. (citing Pacesetter Systems, Inc., 678 F.2d at 95).

The 20 plaintiffs in this federal litigation who were not included in the state case are in privity with the state plaintiffs in the state case. "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different, and parties nominally different may be, in legal effect, the same." Schell v. Walker, 305 N.W.2d 920, 922 (S.D. 1981). Abstention is appropriate because all the plaintiffs have "an opportunity to litigate [their] claims in the South Dakota courts," including the South Dakota

12

Supreme Court.  <u>Oglala Sioux Tribe v. Fleming</u>, 904 F.3d 603, 613 (8th Cir. 2018).  "State courts are competent to adjudicate federal constitutional claims . . . and when a litigant has not attempted to present [their] federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary."  <u>Id.</u> (internal quotation marks and citations omitted).

"[T]he district court has the authority to refuse to hear [a] case if [the case] raises issues that substantially duplicate those raised by a case pending in another court."  <u>Ritchie Capital Mgmt., L.L.C. v. Jeffries</u>, 653 F.3d 755, 763 n.3 (8th Cir. 2011) (referencing <u>United States v. Rice</u>, 605 F.3d 473, 476 (8th Cir. 2010) (citing <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976)); <u>Orthmann</u>, 765 F.2d at 121).  "[T]he federal comity doctrine is best served in this case by dismissing" this federal litigation and allowing the state case to proceed.  <u>Orthmann</u>, 765 F.2d at 121.

Notwithstanding the court's ruling on res judicata and comity, in the interest of judicial economy, the court will proceed to resolve plaintiffs' claims in this court.

C.   <u>STATE-CREATED DANGER CLAIM</u>

To plead a state-created danger claim, plaintiffs must allege:

1.   They were members of a limited, precisely definable group;

2.   Meade County's conduct put plaintiffs at significant risk of serious, immediate, and proximate harm;

3.     The risk to plaintiffs was obvious or known to Meade County;

4.     Meade County acted recklessly in conscious disregard of the risk; and

5.     Meade County's conduct shocks the conscience.

Hart v. City of Little Rock, 432 F.3d 801, 805 (8th Cir. 2005) (internal citations omitted).[2]

1.     FACTS

Accepting the relevant facts of the complaint and drawing all reasonable inferences consistent with the facts in favor of plaintiffs, the allegations to support the state-created danger claim are as follows.

From 1930 until May 1945 U.S. Gypsum mined gypsum from the land which is the subject of this litigation.  (Docket 7 ¶ 10).  Using "room and pillar mining," underground caverns were created so that 90 to 95 percent of the gypsum was extracted leaving pillars of gypsum to support the area above the mine.  Id. ¶ 11.  In the mid-1980s, the South Dakota Cement Plant ("Cement Plant") purchased the tract of land.  Id. ¶ 14.  The Cement Plant mined the surface for gypsum for use in its processing plant.  Id. 16.

On September 15, 1988, the Cement Plant submitted a reclamation plan to the South Dakota Department of Environment and Natural Resources ("DENR") and Meade County.  Id. ¶ 18.  On October 1, 1988, an employee of the Cement Plant contacted the Meade County Planning Commission regarding the reclamation plan.  Id. ¶ 23.  In response, the Planning Commission advised

---

[2]Plaintiffs and Meade County acknowledge these are the five elements of a state-created danger claim.  (Dockets 7 ¶ 54 and 12 at p. 10).

the Cement Plant that Meade County had no zoning requirement, as the state regulations covered mining operations.  Id. ¶ 24.  On December 2, 1988, the Cement Plant notified DENR and Meade County that the subject land would be reclaimed to rangeland status.  Id. ¶ 25.

In 1994, Raymond Fuss purchased the property from the State of South Dakota.  Id. ¶ 26.  Mr. Fuss sold the property to his son Larry Fuss.  Id.  In 2000, Larry Fuss partnered with Keith Kuchenbecker, who was a business partner of Robert Powles, the Meade County Planning Director.  Id. ¶ 27.  Mr. Kuchenbecker and Mr. Fuss drafted a residential development proposal for consideration by Mr. Powles and the other members of the Meade County Planning Commission.  Id. ¶ 28.  The proposal disclosed the existence of the underground gypsum mine.  Id.  The proposal stated "[f]ield boring operation [sic] may be required to identify any cavities that may be a safety hazard."  Id. ¶ 29.

As part of their business arrangement, Mr. Powles would pay for a deep water well and sewer.  Id. ¶ 27.  Mr. Powles planned to sell water to the sanitary district servicing the proposed subdivision.  Id.  Mr. Powles would receive a percentage from the utility bills for each new home built.  Id.  In exchange, Mr. Powles would ensure that Mr. Kuchenbecker's subdivision development proposals were passed by Meade County.  Id.

Meade County Planning Commission member and Meade County Commissioner Robert Mallow lived in close proximity to the planned community.  Id. ¶ 30.  Sometime during the 1960s Mr. Mallow "convinced a

15

division of the armed forces to dynamite the entrances of the mine out of concern for his children." Id.

In late 2001, Mr. Fuss sold his interest in the project to Mr. Kuchenbecker. Id. ¶ 31. During road excavation activities in July 2002, six large voids opened at the surface into the mine. Id. ¶ 32. County inspectors became aware of the situation, the lack of permits for the project, and reported the matter to Kirk Chafee, Meade County Director of Equalization. Id. Mr. Chafee took no action. Id. Commissioner Mallow, who became aware of the issues, took no action. Id. Sewer lines were placed at four feet beneath the surface rather than six feet because of concerns associated with the mine. Id. Inspectors reported the situation to the Meade County Planning Commission but no action was taken. Id.

On September 3, 2003, the Meade County Planning Commission approved the subdivision proposal. Id. ¶ 33. The Meade County Commission approved the proposal sometime later in 2003. Id. The property became known as the Hideaway Hills Subdivision.

During late 2003, Mr. Kuchenbecker began selling subdivision lots to contractors. Id. ¶ 37. Each sale had a disclaimer of liability regarding the gypsum mine. Id. ¶ 38. The disclaimer made it the buyer's responsibility to remediate any subsurface conditions as a result of the past mining activities. Id. Buyers were buying the property "as is" with no warranty by the seller. Id. Meade County began issuing building permits in 2003. Id. ¶ 39. On

September 10, 2003, a large piece of construction equipment fell into the mine.  Id.

In the spring of 2006, a large part of East Daisy Drive in the subdivision collapsed into the mine.  Id. ¶ 40.  When Mr. Kuchenbecker's engineer sought approval to abandon the road, the Meade County Commission rejected that proposal insisting Daisy Drive remain open.  Id. ¶ 41.  Prior to this decision, Meade County approved the addition of 31 lots to the Hideaway Hills Subdivision.  Id. ¶ 43.  These lots were adjacent to and on the canopy of the mine.  Id.  Building permits and certificates of occupancy for 31 homes were subsequently approved by the County Commission.

In 2007, Tom and Sue Kelly discovered the road in front of their home collapsed making their driveway on East Daisy Drive inaccessible.  Id.¶ 45.  The sanitation district agreed to patch the street in front of Kellys' home.  Id.  Kellys were not told the mine may have been the cause of the road collapse.  Id.

In 2010, homeowners on Blue Bell Drive filed a lawsuit in state court.  Id. ¶ 46.  That complaint alleged their homes had been constructed on expansive gypsum tailings.  Id.  In 2011, a large depression formed in the driveway and yard of a home on East Daisy Drive.  Id. ¶ 47.  In March 2020, a sinkhole opened on East Daisy Drive.  Id.  ¶ 48.  This exposed a classic car in the mine.  Id.

On April 27, 2020, Albert Reitz, one of the plaintiffs in this case, experienced a collapse in his yard, the neighbors' yard and part of East Daisy

17

Drive.  Id. ¶ 49.  The collapse exceeded 50 feet wide and over 60 feet deep.  Id.
This is the date plaintiffs allege they discovered or it became known to them
that their homes were built on top of a gypsum mine.  Id.

In April 2021, the Meade County Tax Assessor's Office reassessed for tax
purposes plaintiffs' homes in Hideaway Hills.  Id. ¶ 56.  Using a sliding scale of
a reduction of value, the assessed valuation of plaintiffs' properties decreased
in an amount exceeding 39 million dollars.  Id.  Plaintiffs allege their actual
damages exceed this amount.  Id.

2.     ARGUMENTS OF THE PARTIES

Meade County's motion to dismiss Count 1 focuses on two of the
elements of a state-created danger claim.  Those are the second element,
"immediate and proximate harm" and the fifth element, conduct which shocks
the conscience.  (Dockets 12 at p. 10 and 18 at p. 5).  Meade County argues
plaintiffs allege the county approved the Hideaway Hills Subdivision "and 17
years later, a sinkhole opened and yards collapsed."  (Docket 12 at p. 11).
Defendant submits this progression "is not immediate and proximate harm."
Id. (references omitted).

Additionally, Meade County argues its conduct did not "put Plaintiffs at
risk of serious, immediate, and proximate harm."  Id.  Instead, defendant
contends an allegation in plaintiffs' complaint is "fatal to this element: 'The
land known as Hideaway Hills would have subsided regardless of whether the
Plaintiffs['] homes were built.' "  Id. (citing Docket 7 ¶ 95).

18

Meade County raised the "shock the conscience" argument for the first time in its reply brief.  (Docket 18 at p. 5).  The court will not consider this argument as plaintiffs have not had an opportunity to respond.  North Star Mutual Ins. Co. v. CNH American LLC, No. CIV. 11-4133, 2013 WL 5156457, at *7 (D.S.D. Sept. 12, 2013) (references omitted).  See also Kirt v. Fashion Bug # 3253, Inc., 479 F. Supp. 2d 938, 948 n.4 (N.D. Iowa 2007) ("Raising a new issue in a reply brief . . . generally does not require the court to consider that issue. . . . Ordinarily, inclusion of a new argument in a reply brief is improper as a matter of motion practice in this court[.]") (internal references omitted).

Plaintiffs' response memorandum claims they "were put in a 'risk of,' immediate proximate harm right after moving into the subdivision."  (Docket 17 at p. 7).  Plaintiffs argue:

> The mine began collapsing as the subdivision was being built and continued during the approval of the 32 additional homes to the subdivision.  Collapses occurred frequently thereafter, but remained unknown to the Plaintiffs.  It took years for the residents in the subdivision to learn their homes were above a dangerous underground mine, but the risk of immediate harm never changed.  The County's decisions to approve the subdivision, issue building permits, and make possible all other accommodations put the residents at risk immediately.

Id.  Plaintiffs submit "[t]he question . . . is not how long or how short of a period of time it took for the general community to become aware of the dangerous situation, but whether it was foreseeable that a collapsing mine would continue to collapse."  Id. at p. 8.

3.    RESOLUTION OF COUNT 1

"In [al]most every circuit court decision imposing § 1983 liability because the State affirmatively created or enhanced a danger, 'the immediate threat of harm has a limited range and duration[.]' " <u>Dorothy J. v. Little Rock School District</u>, 7 F.3d 729, 733 n.4 (8th Cir. 1993) (reference omitted).  The court looked to guidance from <u>Martinez v. California</u>, 444 U.S. 277 (1980), in resolving the immediate threat of harm and the limited range and duration issues.  <u>Id.</u>  "In <u>Martinez</u>, a parolee committed murder five months after his release. . . . [and] [t]he Supreme Court affirmed dismissal of the victim's § 1983 complaint, holding that the [victim's] 'death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law."  <u>Id.</u> (citing <u>Martinez</u>, 444 U.S. at 285).  Adopting the rationale of <u>Martinez</u>, the <u>Dorothy J.</u> court concluded an assault on a child at a residential education program was " 'too remote a consequence' of enrolling [the assailant] in the . . . program two years earlier."  <u>Id.</u> (citing <u>Martinez</u>, 444 U.S. at 285).

Giving plaintiffs the benefit of every reasonable inference from the allegations in the complaint, the outside range of state action by Meade County occurred in 2006 when the County Commission approved 31 more lots for the subdivision and subsequently issued certificates of occupancy.[3]

---

[3]The complaint provides no specific chronology as to when certificates of occupancy were issued.  Based on the entirety of the complaint's allegations, the court can only infer the certificates were issued in the 2006 timeframe.

20

Meade County's action "presented a threat of an indefinite range and duration."  Estate of Johnson v. Weber, No. CIV. 12-4084, 2014 WL 2002882, at *8 (D.S.D. 2014) (citing Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002)).  The action of Meade County in 2006 did not present "an immediate and proximate risk of harm."  Id.   Plaintiffs' alleged injuries five years later are "too remote a consequence" of the action by Meade County.  Martinez, 444 U.S. at 285; Dorothy J., 7 F.3d at 733 n.3; Estate of Johnson, 2014 WL 2002882, at *8.

Plaintiffs' state-created danger claim fails to state a claim upon which relief can be granted under § 1983.  Defendant's motion to dismiss Count 1 is granted.

D.    EQUAL PROTECTION CLAIM

Count 2 of the complaint alleges a "class of one" equal protection claim. (Docket 7 at pp. 16-19).  To advance a "class of one" equal protection claim, a plaintiff must plead sufficient allegations, which the court must accept as true, that (1) Meade County treated plaintiff differently from those who are similarly situated and received preferential treatment; (2) Meade County did so intentionally; and (3) there is no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  As the Supreme Court explained,

> the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.

21

Id. (internal quotation marks and citations omitted).  "To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects."  Robbins v. Becker, 794 F.3d 988, 996 (8th Cir. 2015) (internal citation omitted).  "A class-of-one plaintiff must therefore 'provide a specific and detailed account of the nature of the preferred treatment of the favored class,' especially when the state actors exercise broad discretion to balance a number of legitimate considerations."  Id. (citing Nolan v. Thompson, 521 F.3d 983, 990 (8th Cir. 2008) (internal citation omitted).

1.    FACTS

Count 2 alleges a number of other individuals or groups received preferential treatment from Meade County.  The allegations are as follows.

On July 17, 2000, two individuals submitted a proposal to replat a 10-acre parcel inside a flood plain to grow trees.  (Docket 7 ¶ 68).  Planning Commissioner Powles required the plat be edited to specify the property would remain non-residential.  The Meade County Commission approved the replat with Commissioner Mallow opposing the motion.  Id.

On November 20, 2000, two different individuals sought to obtain approval for a preliminary plat of two tracts.  Id. ¶ 69.  Because one of the tracts was in the flood plain, the Meade County Commissioners mandated the plat reflect this lot could never be a building site.  Id.

On October 18, 2004, an individual sought approval of a 24-acre tract for homes.  Id. ¶ 70.  The Planning Commission required the individual to conduct

22

soil borings because the area under development had a history of gypsum mining activities.  Id.  The Commission required the locations of the soil borings be identified on the plat.  Id.

On August 22, 2005, an individual presented a preliminary plat to the Meade County Planning Commission.  Id. ¶ 71.  One of the tracts contained a mobile home.  Id.  The Meade County Commission required the plat to identify the buildable portion of lots in the flood plain and that the flood plain statement from a county ordinance be included on the plat.  Id.  The County Commission required the mobile home be removed from the flood plain and that no future buildings could be located within the flood plain.  Id.  On September 5, 2005, the County Commission rejected the plat as the County's requirements had not been met by the developer.  Id.

On April 21, 2008, a surveyor's representative was directed by the County Commission to conduct soil boring tests and obtain an inspection certificate for previously buried water lines.  Id. ¶ 72.  These directives were forwarded to the Meade County Planning Commission.  Id.

On July 19, 2010, the Meade County Planning Commission, including Mr. Powles, approved a variance for a 2- to 3-child daycare which was located next to an aggregate mine.  Id. ¶ 73.  The mine owner supported the daycare center but wanted the County and the business proprietor to know that the mining operation was a pre-existing activity.  Id. ¶ 74.

The complaint alleges there was no rational basis for the decision of Meade County to approve allowing the Hideaway Hills Subdivision "over a

23

collapsing mine."  Id. ¶ 76.  Particularly since the area had been reclaimed for rangeland and not for home sites.  Id.  Plaintiffs alleged Meade County disregarded plaintiffs' safety by approving the Hideaway Hills Subdivision which enriched Mr. Powles.  Id.

2.    ARGUMENTS OF THE PARTIES

Meade County moves to dismiss Count 2 because plaintiffs "fail[ed] to identify any identical or comparable persons who were treated more favorably." (Docket 12 at p. 12).  Defendant submits "Plaintiffs are not builders or developers and never sought plat approval, exceptions to inspections, or variances concerning their property."  Id. at pp. 12-13.  Meade County argues plaintiffs "are homeowners. . . . [who] fail to identify one single other homeowner, let alone homeowners purportedly owning homes on and adjacent to an actively collapsing underground gypsum mine, who were treated better." Id. at p. 13.   Defendant contends a " 'class-of-one theory does have limits' and does not apply to discretionary decisions."  Id. (citing Robbins,794 F.3d at 995). Because the County is charged with discretion to approve or disapprove plats and similar activities, Meade County concludes treating individuals differently is a consequence of that discretion.  Id. at pp. 13-14 (referencing Engquist v. Oregon Department of Agriculture, 553 U.S. 591, 603 (2008)).

Plaintiffs' response acknowledges they are not builders but "[t]he material aspect. . . [is] the safety concerns displayed by the County" in the other actions alleged in the complaint.  (Docket 17 at p. 9).  They contend "treatment received by the favored class was the County's concern for the

24

safety of every other resident in Meade County subdivisions where Bob Powles was not going to financially benefit from passages of those subdivisions." Id. Plaintiffs assert the approval of the Hideaway Hills plat "was devoid of any legitimate state activity and was wholly sponsored by County corruption." Id. "The passage of the Hideaway Hills plats was not arbitrary," in plaintiffs' view as the plats were approved "because it was going to financially enrich the planning committee chairman." Id. at pp. 9-10.

In reply, Meade County argues plaintiffs miss the crux of defendant's argument.  Defendant submits "Plaintiffs must show they were treated differently from other homeowners, not that developers, builders, or other persons requesting plat approval were treated differently from each other." (Docket 18 at p. 6) (italics omitted).  Because the County's decision-making functions involved the use of discretion, whether to approve a plat or grant a variance, Meade County asserts plaintiffs' "case of one" claim fails. Id. at pp. 6-7.

3.    RESOLUTION OF COUNT 2

Plaintiffs' class-of-one claim fails for a number of reasons.  First, in recognizing a " 'class of one' equal protection claim," the Supreme Court contemplated that "the plaintiff did not allege membership in a class or group," but rather a single plaintiff who was "intentionally treated differently from others similarly situated." Robbins, 794 F.3d at 995 (citing Village of Willowbrook, 528 U.S. at 564).  The courts specifically reference "a single

plaintiff" in considering a class of one claim.  Id. (citing Engquist, 553 U.S. at 602).

Allegations in the complaint assert all 159 plaintiffs were treated the same but differently from other identified individuals.  (Docket 7 ¶¶ 77-81).  By this language, plaintiffs allege that they, in fact, are "members[] in a . . . group."  Robbins, 794 F.3d at 995.  This designation becomes a known class of members seeking damages.  As a group, plaintiffs cannot advance a class of one claim.  Robbins, 794 F.3d at 995; Village of Willowbrook, 528 U.S. at 564; Engquist, 553 U.S. at 602).

Second, plaintiffs' designated comparable individuals who were more favorably treated by Meade County are not "identical or directly comparable to the plaintiff[s] in all material respects."  Robbins, 794 F.3d at 996.  It is not proper to compare homeowners to developers, surveyors or others who ultimately have a role in building homes.  It was plaintiffs' developer and the contractors who may have sought building permits and certificates of occupancy who were more closely aligned with the allegedly comparable individuals in the complaint.

Third, plaintiffs' argument that others had to follow the law by completing soil boring and other activities to develop their property while plaintiffs' developer did not have to do so because of the County's allegedly corrupt decisions, misses the mark.  Plaintiffs arguably received less restrictive "better treatment" than others.  Novotny v. Tripp County, 664 F.3d 1173, 1179 (8th Cir. 2011).

Finally, "[a]lthough the Supreme Court has recognized a 'class-of-one' theory, . . . it has declined to apply the principle against state action 'which by [its] nature involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments.'" Id. (referencing Village of Willowbrook, 528 U.S. at 564; citing Engquist, 553 U.S. at 603).  Plaintiffs' account of the alleged preferential treatment received by others involved the exercise of broad discretion by both the Meade County Planning Commission and the Meade County Commission.  In each instance, the governmental employees and commissioners had "to balance a number of legitimate considerations."  Robbins, 794 F.3d at 996.  Those decisions were "based on a number of subjective factors within the purview of the county officials' discretionary authority."  Novotny, 664 F.3d at 1179.

Plaintiffs' class of one due process claim fails to state a claim upon which relief can be granted under § 1983.  Plaintiffs' Count 2 is dismissed.

E.   INVERSE CONDEMNATION CLAIM

Count 3 asserts an inverse condemnation claim against Meade County. (Docket 7 ¶¶ 77-80).  Plaintiffs bring this constitutional claim under the authority of 42 U.S.C. § 1983.  Id. ¶ 77.

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, . . . prohibits the government from taking private property for public use without just compensation."  Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) (referencing Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226 (1897)).  "The clearest sort of taking occurs when the

27

government encroaches upon or occupies private land for its own proposed use. . . . [E]ven a minimal 'permanent physical occupation of real property' requires compensation under the Clause." Id. (citations omitted).  "[T]here will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." Id. (referencing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)).

" 'The Fifth Amendment right to full compensation arises at the time of the taking' and . . . '[t]he availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim.' " Pakdel v. City & County of San Francisco, California, ___ U.S. ___, 141 S. Ct. 2226, 2229 (2021) (citing Knick v. Township of Scott, 588 U. S. ___, 139 S. Ct. 2162, 2171 (2019).  "[Section] 1983 . . . guarantees a federal forum for claims of unconstitutional treatment at the hands of state officials." Id., 141 S. Ct. at 2230 (citing Knick, 139 S. Ct. at 2167).

A plaintiff asserting a regulatory taking must proceed under one of four theories.  Lingle v. Chevron USA, Inc., 544 U.S. 528, 538 (2005).  Those theories are:

1.  A regulation which "requires an owner to suffer a permanent physical invasion of her property." Id. (internal citation omitted).

2.  A regulation that "completely deprive[s] an owner of all economically beneficial use of her property." Id.  (brackets omitted) (internal citation omitted).

3.    A governmental requirement that, without sufficient justification, requires an owner to "dedicate" a portion of his property in exchange for a building permit.  Id. at 546-48 (internal citation omitted).

4.    Any other regulation which, after considering its economic impact upon the plaintiff and its essential character, is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  Id. at 538-39 (internal citation omitted).

1.    FACTS

The complaint alleges Meade County took plaintiffs' land by the approval of the Hideaway Hills plat in 2003 and the approval of the second plat adding 31 homesites in 2006.  (Docket 7 ¶ 79).  It is alleged these County actions effectively took plaintiffs' lands without compensating them for their loss in violation of the Fifth and Fourteenth Amendments.  Id. ¶¶ 77-80.

2.    ARGUMENTS OF THE PARTIES

Meade County's motion to dismiss Count 3 is premised on a number of grounds.  Defendant argues there are "two basic elements required for a taking: (1) physical occupation by the government; or (2) a regulatory taking [by] the government[.]"  (Docket 12 at p. 14).

First, defendant asserts plaintiffs' claim must fail because there has been "no physical taking by Meade County."  Id. at  p. 15.   Second, Meade County submits there has been no regulatory taking.  Id.  Third, defendant claims there has been no taking by Meade County of plaintiffs' property for a public use.  Id. at p. 17.  Meade County argues it "has not authorized any use by the public [of plaintiffs' land], has never owned the property or mineral rights, and

never mined the property." Id.  For these reasons, defendant argues "[t]he 'public use' element is lacking." Id.

Plaintiffs' response asserts "[t]he regulation at issue is stated in the . . . complaint." (Docket 17 at p. 10).  That regulation according to plaintiffs' brief is the rangeland standard of reclamation proposed by the State of South Dakota and adopted by Meade County by acquiescence.  Id.  In plaintiffs' view, "[t]his restriction or regulation caused the Plaintiffs' land to be unconstitutionally taken by the county." Id.  "The 'rangeland' standard of reclamation is vastly different" plaintiffs argue "from the very exacting and high standards of reclamation for homesites for which the land was ultimately approved by the County's actions." Id. at pp. 10-11.

Plaintiffs contend they "are not barred as post-enactment purchasers from receiving compensation under a regulatory taking claim theory." Id. at p. 12.  Plaintiffs argue they "may pursue their claims now even though Meade County's decision to restrict the property to rangeland [occurred] prior to Plaintiffs' ownership." Id. (referencing Palazzolo, 533 U.S. at 628) ("It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner."). Plaintiffs argue "[r]estricting the property to rangeland was a 'public use,' since the restriction was for the benefit of the public, for the protection of the public and not a valid exercise of police power in this instance." Id.

Because South Dakota's administrative rule concerning rangeland reclamation was "proposed to the County and the County adopted this regulation[,]" plaintiffs contend this administrative restriction "embraced the broader and more natural interpretation of public use as 'public purpose.' " Id. at p. 13. (referencing Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 158-64 (1896)). Plaintiffs submit "[t]he State administrative rules that restricted this property to 'rangeland,' a restriction that was agreed to by the County, were not a valid exercise of the County's police powers." Id. at p. 14. As the rangeland "regulation has gone too far[,]" Plaintiffs conclude the regulation is unconstitutional "without the payment of just compensation." Id. (referencing John Corp. v. City of Houston, 214 F.3d 573, 578 (5th Cir. 2000) ("The Supreme Court's entire 'regulatory takings' law is premised on the notion that a city's exercise of its police powers can go too far, and if it does, there has been a taking.").

   3.   RESOLUTION OF COUNT 3

The complaint does not allege an actual physical taking of plaintiffs' property and plaintiffs' brief does not make that argument. (Docket 17 at pp. 12-14). Plaintiffs assert a regulatory taking of their property. (Docket 7 ¶¶ 77-80). Plaintiffs' brief does not identify which category of regulatory taking is applicable to their claim. See Docket 17.

It appears the plaintiffs are claiming either a second type of regulatory taking, that is, a regulation which "completely deprive[s] an owner of all economically beneficial use of [their] property"; or the fourth type, any other

31

regulation which, after considering its economic impact upon the plaintiff and its essential character, is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from [their] domain." Lingle, 544 U.S. at 538-39. The other types of regulatory taking are not applicable to the allegations in the complaint.

The Supreme Court identifies "two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992). "The first encompasses regulations that compel the property owner to suffer a physical 'invasion' of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, [the court has] required compensation." Id. "The second situation in which [the court] found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land." Id.

The complaint alleges a regulatory taking of plaintiffs' properties occurred because of the 2003 final approval by Meade County of the Hideaway Hills plat and its 2006 approval of an additional 31 homesites plat. (Docket 7 ¶ 79). The complaint asserts it was the approval of the "plats, building permits and certificates of occupancy" which "were executed with such an extreme degree of recklessness that destruction and devaluation of the [plaintiffs'] properties was foreseeable." Id. ¶ 80.

32

Yet, in their brief, plaintiffs argue the objectionable action by Meade County was its acquiescence and adoption by inference of the South Dakota rangeland reclamation regulation.  (Docket 17 at p. 10).  Plaintiffs contend "[r]estricting the property to rangeland was a 'public use,' since the restriction was for the benefit of the public, for the protection of the public, and not a valid exercise of police power in this instance."  Id. at p. 12.  Plaintiffs argue they have standing to assert an adverse condemnation claim because a challenge of the rangeland regulation was not yet ripe so as to permit the previous owner, the developer, to assert that claim.  Id.

Plaintiffs' position is without merit.  Contrary to plaintiffs' argument, the rangeland regulation, as well as its purported application to the property which became the Hideaway Hills Subdivision, was ripe for challenge in 2003.  Nothing about the language or application of the rangeland regulation changed after 2003 so as to limit the right of the developer of the subdivision to challenge the regulation's application to that property.  A challenge was ripe in 2003 to the rangeland designation and approval of the subdivision plat for home building.  Because the developer chose not to acknowledge the conflict does not mean plaintiffs can assert this claim 18 years later.

Whether the Hideaway Hills Subdivision was to be limited to rangeland activities or authorized for home building, that decision was made before plaintiffs purchased their lots in the subdivision.  It is neither illogical nor unfair to bar plaintiffs' regulatory taking claim where the previous owner had

all the necessary facts with which to assert a regulatory taking claim in 2003. <u>Palazzolo</u>, 533 U.S. at 628.

Plaintiffs did not suffer a "physical invasion" of their property nor were they denied "economically beneficial or productive use" by the decision of Meade County not to implement the rangeland reclamation regulation but to permit the property to be used for home building.  <u>Lucas,</u> 505 U.S. at 1015 (internal quotation marks omitted).  Plaintiffs did not suffer a "physical invasion" of their property nor were they denied "economically beneficial or productive use" of their property by the decisions of Meade County to approve the 2003 and 2006 plats.  <u>Id.</u> (internal quotation marks omitted).

Based on the facts alleged in the complaint and all reasonable inferences associated with those facts, plaintiffs fail to state a claim for inverse condemnation.  Defendant's motion to dismiss Count 3 is granted.

F.    <u>INVERSE CONDEMNATION—STATE CLAIM</u>

The complaint alleges an inverse condemnation state claim in violation of Article VI § 13 of the South Dakota Constitution.  (Docket 7 ¶¶ 81-86).  Section 13 of Article VI provides that "[p]rivate property shall not be taken for public use, or damaged without just compensation, which will be determined according to legal procedure established by the Legislature and according to § 6 of this article."  South Dakota Constitution, Art. VI § 13.  Section 6 of Article VI mandates a jury trial , a right which "shall extend to all cases at law without regard to the amount in controversy[.]"  South Dakota Constitution, Art. VI § 6.

34

The South Dakota Constitution differs from the Fifth Amendment of the United States Constitution in that South Dakota imposes " 'public use' requirements that are more strict than the federal baseline." Krier v. Dell Rapids Township, 709 N.W.2d 841, 846 (S.D. 2006).  Also, the South Dakota Constitution "requires that the government compensate a property owner not only when a taking has occurred, but also when private property has been 'damaged.' " Id.  "Under the taking and damaging clause . . . it is a basic rule . . . governing compensation for consequential damages that where no part of an owner's land is taken but because of the taking and use of other property so located as to cause damage to an owner's land, such damage is compensable if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole." Id. at 847 (citing State Highway Commission v. Bloom, 93 N.W.2d 572, 577 (1958)).

In South Dakota, an inverse condemnation claim "is maintainable where a governmental entity causes an invasion of the land by 'water, earth, sand, or other matter or artificial structures placed upon it, so as effectually to destroy or impair its usefulness . . . [,]' but that it is not required 'that the damage shall be caused by a trespass or an actual physical invasion of the owner's real estate[.]' " Rupert v. City of Rapid City, 827 N.W.2d 55, 61 (S.D. 2013) (citing Searle v. City of Lead, 73 N.W. 101, 103-04 (S.D. 1897)).

1.    FACTS

As with Count 3, plaintiffs allege the state action was Meade County's 2003 approval of the Hideaway Hills plat and its 2006 approval of the second

plat adding 31 home sites.  (Docket 7 ¶ 83).  The complaint alleges the approval

of the two "plats, building permits and certificates of occupancy were executed

with such an extreme degree of recklessness that destruction and devaluation

of [plaintiffs'] properties was foreseeable."  Id. ¶ 84.  The claim alleges "[t]he

direct and foreseeable effect of approving the final plats . . . were the placement

of artificial structures on the land.  The issuance of building permits and

certificates of occupancy for these artificial structures caused the invasion of

[plaintiffs'] land.  The usefulness of the land has been impaired and destroyed."

Id. ¶ 86.

2.    ARGUMENTS OF THE PARTIES

Meade County seeks dismissal of Count 4 for several reasons.  Defendant

argues "[e]ven if the 'placement of artificial structures on the land' (Plaintiffs'

own houses) was a 'direct and foreseeable effect of approving' the plat for the

subdivision, Meade County did not cause any artificial structures to be placed

upon Plaintiffs' land."  (Docket 12 at p. 21).  Defendant asserts "[t]here was no

requirement by Meade County that homes be built or that they be built in a

specific manner or to a specific degree."  Id.  Meade County contends the

complaint fails to identify "what property, other than the Plaintiffs', was taken

that caused consequential damages to [plaintiffs'] property."   Id.

 Plaintiffs' brief submits "[i]n the interest of judicial efficiency, . . . the

state law claims for inverse condemnation be incorporated into the . . .

arguments supporting federal claims of inverse condemnation."  (Docket 17 at

p. 14).  Plaintiffs represent their "state law claims . . . are not materially

dissimilar and arise from the same set of facts [as the federal inverse condemnation claim]." Id.

### 3.   RESOLUTION OF COUNT 4

Plaintiffs' assertion that their homes constitute "artificial structures" so as come within the scope of Rupert is an overreach which defeats the inverse condemnation—state claim. Rupert, 827 N.W.2d at 61. The clear intent and guidance of Rupert is that Meade County may be held responsible if it caused or placed "water, earth, sand . . . or artificial structures" on plaintiffs' land "so as effectually to destroy or impair [plaintiffs' land's] usefulness." Id. Meade County did not cause or place artificial structures on plaintiffs' land—plaintiffs and their building contractors placed homes on the lots in Hideaway Hills Subdivision. Nor did Meade County cause or place structures on other property which allowed "water, earth, sand or other matter" to migrate to or have an impact upon plaintiffs' property effectively destroying or impairing the usefulness of their property. Rupert, 827 N.W.2d at 61. Approving plats, granting building permits and issuing certificates of occupancy before property may be inhabited are not the types of County action upon which a state claim of inverse condemnation may proceed.

Plaintiffs' claim is without merit. Plaintiffs did not suffer a "physical invasion" of their property nor were they denied "economically beneficial or productive use" by the decision of Meade County to not use the rangeland reclamation designation but to permit the property to be used for home building. Lucas, 505 U.S. at 1015 (internal quotation marks omitted).

37

Plaintiffs did not suffer a "physical invasion" of their property nor were they denied "economically beneficial or productive use" of their property by the decisions of Meade County to approve the 2003 and 2006 plats.  <u>Id.</u> (internal quotation marks omitted).

Plaintiffs' inverse condemnation—state allegations fail to state a claim upon which relief can be granted.  Defendant's motion to dismiss Count 4 is granted.

## IV.   ORDER

Based on the above analysis, it is

ORDERED that Defendant Meade County's motion to dismiss (Docket 11) is granted.

IT IS FURTHER ORDERED that plaintiffs' amended complaint (Docket 7) is dismissed with prejudice.

Dated August 29, 2022.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE